IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TOBIAS B.,  )  )  Plaintiff,  )  )  v.  )  )  KILOLO KIJAKAZI,[1]  )  Commissioner of Social Security,  )  )  Defendant.  ) | No. 20-cv-2959  Magistrate Judge Jeffrey I. Cummings |

**MEMORANDUM OPINION AND ORDER**

Tobias B. ("Claimant") moves to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIBs").[2] The Commissioner brings a cross-motion seeking to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). For the reasons that follow, Claimant's motion to reverse the decision of the Commissioner, (Dckt. #21), is granted and the Commissioner's motion to uphold the decision to deny benefits, (Dckt. #22), is denied.

**I.      BACKGROUND**

   **A.      Procedural History**

Claimant first filed a DIBs application on September 15, 2014, alleging a disability onset

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by his first name and the first initial of his last name. Acting Commissioner of Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

[2] Although Claimant's motion states that he filed an application for both DIBs and Supplemental Security Income, (Dckt. #21 at 3), it appears he only applied for DIBs.

1

date of March 18, 2008. At the time of Claimant's alleged onset date, he was forty-eight years old. His claim was denied initially and upon reconsideration. Claimant filed a timely request for a hearing, which was held on May 19, 2017, before Administrative Law Judge ("ALJ") Diane S. Davis. (Administrative Record ("R.") 28-59). ALJ Davis issued a written decision denying Claimant's application for benefits on October 3, 2017. (R. 13-22). Claimant appealed to this Court, which granted the parties' agreed motion for reversal and remanded the case for further administrative hearings on June 26, 2019. (R. 1424). ALJ Kathleen Kadlec held a supplemental hearing on December 18, 2019, (R. 1311-54), and issued a second decision denying Claimant's application for benefits on January 21, 2020. (R. 1270-86). This action followed.

      **B.**      **The Social Security Administration Standard to Recover Benefits**

To qualify for disability benefits, a claimant must demonstrate that he is disabled, meaning he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). At step two, the SSA determines whether the claimant has one or more medically determinable physical or mental impairments. 20 C.F.R. §404.1521. An impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* In other words, a physical

2

or mental impairment "must be established by objective medical evidence from an acceptable medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind. Oct. 22, 2019). If a claimant establishes that he has one or more physical or mental impairments, the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, he is considered disabled and no further analysis is required. If the listing is not met, the analysis proceeds. 20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess the claimant's residual functional capacity ("RFC"), or his capacity to work in light of the identified impairments. Then, at step four, the SSA determines whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake his past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given his RFC, age, education, and work experience. If such jobs exist, he is not disabled. 20 C.F.R. §404.1520(a)(4)(v).

  **C.**  **The Evidence Presented to the ALJ**

Claimant seeks DIBs due to limitations from high blood pressure, high cholesterol, diabetes, right knee pain post surgeries, and hearing loss. (R. 242, 274). Claimant alleges an onset date of March 18, 2008, and his date last insured was December 31, 2014. (R. 1285).

3

Because Claimant's arguments on appeal concern only his left shoulder and right knee impairments, (Dckt. #22 at 2), the Court limits its discussion of the evidence accordingly.

### 1.   Medical Records Related to Claimant's Knee

On September 27, 2005, Claimant underwent an arthroscopy with medial meniscectomy and chondroplasty to repair a torn medial meniscus in his right knee. (R. 1256). After the surgery, Claimant returned to work as a corrections officer in a maximum-security prison. Over the next few months, Claimant continued to experience knee pain, which did not respond to a corticosteroid injection or Synvisc injections. (*Id.*). In June 2006, an updated MRI "demonstrated a recurrent medial meniscus tear." (*Id.*). Although Claimant was capable of full extension and reported minimal tenderness, the MRI showed a "through and through tear of the posterior horn of the medial meniscus," and Claimant's treating provider recommended that he undergo a second arthroscopic medial meniscectomy. (*Id.*). Sherwin Ho, M.D., performed the operation with no complications on October 3, 2006. (R. 1224-25, 1248-49).

Claimant did not report any knee pain from October 2006 through December 2013. Treatment notes from this period indicate that Claimant presented with no distress, normal gait, normal strength, and no edema. (R. 347, 403, 851, 853, 856-57, 861-62, 1145, 1154, 1157). On December 26, 2013, however, Claimant's treating physician, Deirdra Greathouse-Williams, M.D., noted that Claimant complained of pain in his right knee, which was swollen. (R. 847). She prescribed Naprosyn and Ultram to treat the pain, gave Claimant an injection, and ordered an x-ray. (*Id.*). Imaging of the right knee showed:

> mixed underlying bony demineralization . . . some degenerative spurring and contour change at the margins of the patella and to a lesser extent at the distal femur and proximal tibia . . . some asymmetric narrowing of the medial femoral-tibial plateau . . . [and] some rounded sclerosis noted at the base of the tibial intercondylar eminence possibly reactive or degenerative.

(R. 877). Claimant was diagnosed with "degenerative bony changes with some mild by asymmetric narrowing of the medial femoral/tibial compartment and some sclerosis of the proximal tibia." (R. 877).

About two weeks later, on January 7, 2014, Claimant again reported right knee pain and stiffness. (R. 845). Dr. Greathouse-Williams observed marked warmth and edema of the knee and prescribed Claimant prednisone. (*Id.*). Claimant was told to follow up in one week if his knee pain did not improve, but he did not schedule another appointment until May 5, 2014, at which time he did not complain of any knee pain. (R. 844). There were no further complaints of knee pain in the record. Treatment notes after January 2014 consistently indicated that Claimant had no tenderness, swelling, or edema in his extremities and presented with no distress, a normal gait, normal range of motion, and normal strength. (R. 542, 571, 607, 1138, 1260, 1262, 1269).

2. **Medical Records Related to Claimant's Shoulder**

Claimant began experiencing left shoulder pain in September 2012, for which Dr. Greathouse-Williams prescribed Vicodin. (R. 867). A September 17, 2012 MRI of the shoulder revealed "moderate arthrosis of the acromioclavicular ("AC") joint with associated edema and inflammatory changes," as well as reactive marrow changes within the AC joint and down-sloping of the acromion laterally with narrowing of the supraspinatus outlet. (R. 870). The reviewing physician recommended clinical correlation "to exclude impingement syndrome." (*Id.*). Claimant was scheduled for shoulder surgery to treat the issue in November 2012, (R. 861), but he decided not to have the procedure, (R. 1369).

At an appointment on February 9, 2013, Claimant informed Dr. Greathouse-Williams that "his shoulder [was] not bothering him anymore." (R. 857). He credited his medication with relieving the pain. (*Id.*). On May 8, 2013, however, Claimant again reported shoulder pain. (R.

855). He was prescribed Propanolol for his resting tremor and referred to neurological and orthopedic consults. (*Id.*). No subsequent notes discuss Claimant's shoulder impairment.

### 3. Evidence from State Agency Consultants

State agency consultant Young-Ja Kim, M.D., reviewed Claimant's file on April 9, 2015. Dr. Kim noted that the record included no medical or opinion evidence and he concluded that there was insufficient evidence to evaluate the claim. (R. 63-64). State agency consultant Martin B. Lahr, M.D., reviewed Claimant's file on August 7, 2015, and also found insufficient evidence to evaluate Claimant's impairments. (R. 73).

### 4. Function Reports and Hearing Testimony

In a function report completed on January 13, 2015, Claimant indicated that he was "unable to stand for long period of time." (R. 262). Although he had no problem with personal care and was able to drive, cook, do laundry, load the dishwasher, and use a riding lawnmower, (R. 263-65), Claimant opined that he could only lift twenty pounds, would lose his balance when squatting or bending, experienced pain when reaching, and could not stand or walk for more than thirty minutes at a time. (R. 267). Claimant further noted that he required a cane and a brace for longer periods of walking. (R. 268).

At Claimant's initial hearing on May 19, 2017, Claimant testified that he could only stand for twenty to thirty minutes at a time before needing to rest and could only sit for fifteen to twenty minutes before his knee would stiffen. (R. 1373). He testified that he was unable to crouch or stoop and could only walk twenty minutes before needing to stop due to swelling in his knee. (R. 1376). The ALJ did not question Claimant regarding his impairments during the 2019 hearing, which focused on the vocational testimony and how Claimant's past work was performed. (R. 1314).

### D. The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity from his alleged onset date of March 18, 2008, through his date last insured of December 31, 2014. (R. 1275). At step two, the ALJ determined that Claimant suffered from the severe impairment of "degenerative joint disease of the right knee, status post arthroscopy." (*Id.*). Among other impairments, the ALJ classified Claimant's degenerative joint disease of the left shoulder as non-severe. (R. 1276-77).

At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments. (R. 1278-79). Before turning to step four, the ALJ determined that, through his date last insured, Claimant had the RFC to perform medium work with the following limitations:

> [H]e can operate foot controls with right foot frequently; frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, crawl; occasionally work at unprotected heights; frequently be exposed to moving mechanical parts and vibration; and frequently operate a motor vehicle.

(R. 1279). Based on this conclusion, the ALJ determined at step four that Claimant was capable of performing his past relevant work as a food service supervisor/correctional officer, and as an EMT/correctional officer. (R. 1283). As such, the ALJ found that Claimant was not disabled at any time from March 18, 2008, through December 31, 2014. (R. 1285).

## II. STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial

7

evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

### III. ANALYSIS

    **A. The ALJ erred by independently assessing medical evidence submitted after the state agency consultants had rendered their opinions.**

In his single-issue motion, Claimant contends that the ALJ erred by failing to seek a medical opinion regarding the July 2006 MRI of his right knee and the September 2012 MRI of his left shoulder. (Dckt. #21 at 4). Claimant alleges that by interpreting this evidence herself, the ALJ impermissibly "played doctor." The Court agrees.

The Seventh Circuit has repeatedly held that an ALJ may not "play [] doctor and interpret new and potentially decisive medical evidence without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (internal quotation marks and citation omitted); *see also Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018); *Akin v. Berryhill*, 887 F.3d 314, 317–18 (7th Cir. 2018); *Moreno v Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018). The Commissioner responds that the Seventh Circuit typically finds that an ALJ "played doctor" only when "the ALJ failed to address relevant evidence." (Dckt. #22 at 8-9) (citing *Dixon v. Massanari*, 270 F.3d 1171 (7th Cir. 2001)). Since *Dixon*, however, the Seventh Circuit has clarified that the relevant question when determining whether an ALJ should have sought additional medical review is not *what* evidence the ALJ considered, but whether she was qualified to do so. In *Kemplen v. Saul*, the Seventh Circuit summarized its prior holdings as providing the following standard: "the ALJ must seek an additional medical opinion if there is potentially decisive evidence that postdates the state agency consultant's opinion." 844 Fed.Appx. 883, 888 (7th Cir. 2021) (citing cases). In other words, the issue "comes down to whether the new information 'changed the picture so much that the ALJ erred by . . . evaluating [herself] the significance of [the subsequent] report.'" *Id.* (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016)).

Here, the evidence submitted after the state agency consultants' review undoubtedly "changed the picture" enough to necessitate an updated medical assessment because the state agency consultants did not render *any* opinion as to Claimant's limitations, citing insufficient evidence. (R. 63, 73).³ *See Sherry R. v. Saul*, No. 1:20-cv-01116-TAB-TWP, 2021 WL

---

³ The Commissioner asserts that the Seventh Circuit "has upheld decisions in which ALJ's have evaluated medical records." (Dckt. #22 at 8) (citing cases). However, none of the cases cited involved situations where – as here – the ALJ either interpreted MRIs without the input of a medical professional or ignored MRIs altogether. This case is similarly distinguishable from those cases where the Seventh Circuit has "upheld the denial of benefits when MRI evidence post-dating the state agency consultant's report showed only mild changes in the claimants' . . . conditions," *Kemplen*, 844 Fed.Appx. at 887 (citing *Keys*

9

1884426, at *5 (S.D.Ind. May 11, 2021) (finding the ALJ improperly played doctor where "the bulk of Plaintiff's mental health records were not available for the state agency psychologists"); Without any medical opinions in the record – whether from a state agency consultant or treating physician – it is unclear what the ALJ relied on in determining Claimant's RFC, aside from her own interpretation of medical evidence, which is an impermissible source. *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves."). Furthermore, even if the state agency consultants had rendered an opinion as to Claimant's RFC, remand would be necessary because both the 2012 MRI of Claimant's shoulder and the 2013 imaging of Claimant's knee constitute "potentially decisive medical evidence," which the ALJ was unqualified to interpret. The Court will address each in turn.

### 1. The ALJ impermissibly assessed the 2012 MRI of Claimant's shoulder without the assistance of a medical expert.

The Seventh Circuit has been especially critical of ALJs' attempts to deduce the meaning of complex medical documents, such as MRIs. *See, e.g., McHenry*, 911 F.3d at 871 ("We agree with McHenry that the ALJ impermissibly assessed the MRI report on his own without the assistance of a medical expert."); *Akin*, 887 F.3d at 317 ("[W]ithout an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment."); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir.

---

*v. Berryhill*, 679 Fed.Appx. 477 (7th Cir. 2017); *Olsen v. Colvin*, 551 Fed.Appx. 868 (7th Cir. 2014)). In *Keys* – unlike here – the agency physicians reviewed certain MRIs from the claimant but did not review the most recent MRIs and the Seventh Circuit found that there was no evidence that the unreviewed MRIs would have changed the physicians' opinions. *Keys*, 679 Fed.Appx. at 480-81. In *Olsen*, the record contained findings from the physicians who ordered claimant's MRIs and the Seventh Circuit found that claimant failed to show that the ALJ's conclusion regarding the MRIs – which was consistent with the physicians' findings – was incorrect. *Olsen*, 551 Fed.Appx. at 874-75. In this case, by contrast, the record contains no evidence from any physician regarding Claimant's MRIs.

2014) ("Fatally, the [ALJ] failed to submit that MRI to medical scrutiny, as she should have done since it was new and potentially decisive medical evidence."). This is especially true when the MRIs – and the notes accompanying them – are replete with the kind of "barely intelligible medical mumbo jumbo," that the Seventh Circuit has warned against relying on. *Goins*, 764 F.3d at 680 (7th Cir. 2014); *see also Israel v. Colvin*, 840 F.3d 432, 439-440 (7th Cir. 2016) ("Because no physician in the record has opined on whether these [MRI] results are consistent with Israel's claim of disabling pain, and because the reports are replete with technical language that does not lend itself to summary conclusions, we cannot say whether the results support or undermine Israel's claim.").

In this case, the 2012 MRI of Claimant's shoulder revealed "moderate arthrosis of the [AC] joint with associated edema and inflammatory changes," as well as reactive marrow changes within the AC joint and down-sloping of the acromion laterally with narrowing of the supraspinatus outlet. (R. 870). Although Claimant never received the surgery that was recommended to treat such a condition, the ALJ found that Claimant's "left shoulder issue resolved . . . with no additional treatment." (R. 1282). This finding was not based on the opinion of any medical professional, but rather on Claimant's "normal extremity motion" and infrequent reports of shoulder pain. (R. 1276).

Because normal extremity motion and infrequent pain are not necessarily inconsistent with Claimant's reports that he could lift no more than twenty pounds, the ALJ's explanation was insufficient to build the requisite logical bridge between the evidence and her conclusion that Claimant's shoulder impairment did not prevent him from performing medium work. *See Lambert*, 896 F.3d at 774 (finding that the ALJ's reliance on x-ray results to discount claimant's reports of pain was improper where no medical source had opined that the x-ray findings were

11

inconsistent with complaints of disabling pain); *Brown v. Colvin*, 845 F.3d 247, 253 (7th Cir. 2016) (finding the ALJ improperly substituted his judgment for a doctor's when the ALJ failed to explain why the claimant's normal reflexes and mild to moderate range-of-motion limitations were inconsistent with the doctor's opinions); *Hoyt v. Colvin*, 553 Fed.Appx. 625, 627 (7th Cir. 2014) (finding ALJ played doctor by independently interpreting electromyography exam and lumbar MRI as inconsistent with claimant's pain complaints). On remand, the ALJ should obtain a medical opinion regarding whether Claimant's shoulder impairment – as documented in the 2012 MRI – would have prevented him from engaging in medium work, which involves "lifting no more than [fifty] pounds at a time with frequent lifting or carrying of objects weighing up to [twenty-five] pounds." 20 CFR 404.1567(c).

        **2.**      **The ALJ impermissibly assessed medical images of Claimant's knee without the assistance of a medical expert.**

The ALJ was similarly unqualified to interpret two medical images of Claimant's right knee. First, a 2006 MRI of the knee showed a "through and through tear of the posterior horn of the medial meniscus." (R. 1256). Even after Claimant underwent an arthroscopic medial meniscectomy to address the problem, his postoperative diagnoses were "recurrent medial meniscus tear, right knee," and "grade 4 chondral injury of femoral trochlea." (R. 1248). Although Claimant did not report knee pain for years following the surgery, his symptoms resurfaced on December 26, 2013. (R. 847). Updated images of the knee showed:

> mixed underlying bony demineralization . . . some degenerative spurring and contour change at the margins of the patella and to a lesser extent at the distal femur and proximal tibia . . . some asymmetric narrowing of the medial femoral-tibial plateau . . . [and] some rounded sclerosis noted at the base of the tibial intercondylar eminence possibly reactive or degenerative.

(R. 877). The treating physician diagnosed "degenerative bony changes with some mildly asymmetric narrowing of the medial femoral/tibial compartment and some sclerosis of the

proximal tibia." (R. 877). On January 7, 2014, Claimant again reported knee pain and stiffness and Dr. Greathouse-Williams observed marked warmth and edema of the knee. (R. 845).

As with the treatment notes summarizing Claimant's shoulder MRI, the 2006 and 2013 images of Claimant's knee do not lend themselves to layperson interpretation. Accordingly, the ALJ's finding that Claimant was capable of medium work despite his knee impairment was not adequately supported. Although the ALJ noted that Claimant's condition improved following the 2006 surgery and that he frequently presented with normal muscle strength and normal gait throughout his period of disability, she again failed to explain how this evidence was necessarily inconsistent with Claimant's reports of being unable to stand for more than twenty to thirty minutes at a time, sit for more than fifteen to twenty minutes at a time, or walk for only ten to twenty minutes at a time.[4] *See Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) (finding the ALJ's analysis did not provide a rational basis for the denial of benefits where he relied on portions of the medical record that did not obviously contradict the Claimant's assertions, instead of soliciting the opinion of a physician); *Charles B. v. Saul*, No. 18 C 1377, 2019 WL 3557055, at *9 (N.D.Ill. Aug. 1, 2019) (remanding where the ALJ "improperly resorted to playing doctor when he found that evidence of full strength in [the claimant's] extremities was inconsistent with [the treating physician's] opinion on [the claimant's] limitations and severe pain.").

No medical professional opined that Claimant was capable of medium work – which requires standing or walking, off and on, for approximately six hours of an eight-hour workday, SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983) – despite his various knee diagnoses. For this reason, too, the ALJ's RFC assessment is not properly supported.

---

[4] The Court also notes that the ALJ mischaracterized the record regarding the speed with which Claimant's knee improved following the December 2013 reports of swelling and edema. The ALJ stated that Claimant's edema had resolved by February 2014, but cited a record from February 2012. (R. 1281) (citing R. 1154).

**B.     The proper remedy is reversal for further proceedings, rather than an award of benefits.**

Claimant asks that the Court not only reverse the decision of the Commissioner, but remand with instructions to grant benefits. (Dckt. #21 at 13). Such a remedy is only appropriate where "the record can yield but one supportable conclusion." *Martin v. Saul*, 950 F.3d 369, 376 (7th Cir. 2020), *quoting Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993). For the same reason that ALJs cannot interpret medical evidence without the assistance of medical professionals, neither can the Court. Accordingly, the Court is unable to find that Claimant is unquestionably disabled and the case must be remanded for further proceedings. *See Martin*, 950 F.3d at 377 ("The vast majority of the time we will not award benefits and instead remand for further proceedings.").

## CONCLUSION

For the foregoing reason, Claimant's motion to reverse the Commissioner's decision to deny DIBs, (Dckt. #21), is granted and the Commissioner's motion to uphold the denial of benefits, (Dckt. #22), is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**ENTERED:** September 20, 2022

*Jeff Cummings*

_____
**Jeffrey I. Cummings**
**United States Magistrate Judge**